NOT DESIGNATED FOR PUBLICATION

No. 127,882

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSHUA D. FREIMARK,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN M. SMITH, judge. Submitted without oral argument. Opinion filed August 14, 2026. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before MALONE, P.J., ATCHESON, J., and MICHAEL B. BUSER, retired Court of Appeals Judge, assigned.

PER CURIAM: Jurors sitting in Sedgwick County District Court convicted Defendant Joshua D. Freimark of aggravated robbery for sticking a handgun in the face of the manager of a pizza restaurant and making off with the business' receipts from the previous day. And they convicted him of five counts of possessing a firearm after a felony conviction for a small arsenal he had assembled in his apartment. On appeal, Freimark contends he was deprived of a fair trial both because the State failed to disclose that the manager had been shown a photo array of suspects and reluctantly picked one as

1

possibly being the culprit and because the prosecutor made an improper closing argument to the jury. We find nothing amounting to reversible error on those points and affirm Freimark's convictions and sentences.

FACTUAL AND PROCEDURAL HISTORY

About midmorning on a Monday in March 2020, Casey Spencer, the manager of a Little Caesars Pizza restaurant in Wichita, went to her car in the parking lot behind the establishment to take several days' receipts to the bank. She noticed a car she did not recognize in the parking lot. A heavyset white man with graying facial hair approached her, brandished a handgun, and wrestled the bank bag from her hands. The man bolted through an opening in the fence, and in the meantime, the car pulled out of the parking lot.

Spencer returned to the restaurant and had another employee immediately call the police. She told a responding Wichita police officer that the robber wore a camo vest with a light colored shirt underneath and a hat. But Spencer said the man had a bandana mask, so she could not make a facial identification of him. The restaurant's security camera covering the parking lot was not working. One of the investigating officers obtained a video from a nearby business that showed the robber getting out of a car in the parking lot, although the robbery itself occurred outside the camera's view. The car was distinctive—it had a temporary tag, a beat-up appearance, and a "donut" spare tire on the front right wheel.

Later in the day, another Wichita police officer saw the car at a convenience store with a woman driving and a male passenger generally matching the physical description of the robber though wearing different clothing. The officer watched the car as the man and the woman got out. The man went into the convenience store. The officer wasn't sure where the woman went. Neither of them returned to the vehicle. Investigators impounded

2

and searched the car; they found an identification card and various documents in Freimark's name. Investigators turned up a lead on an apartment where Freimark likely lived. Three days after the robbery, officers went to the apartment complex. They saw Freimark walking a dog. An officer contacted the apartment manager and reviewed security video from the morning of the robbery. The video showed Freimark with a temporary car tag and dressed as Spencer had described the robber. Freimark and a woman got into a car matching the one in the Little Caesars parking lot and left the apartment complex. The video timestamp indicated they departed about an hour before the robbery.

Investigators obtained a search warrant for Freimark's apartment. They found clothing consistent with Spencer's description of what the robber wore. In a bedroom, they recovered five firearms. In an amended complaint, the State charged Freimark with one count of aggravated robbery, a severity level 3 person felony violation of K.S.A. 21-5420(b)(1), and five counts of possession of a firearm after a felony conviction, severity level 8 nonperson felony violations of K.S.A. 2019 Supp. 21-6304(a)(3)(A).

The jurors heard evidence and returned their verdicts convicting Freimark as charged in late August 2023—almost three and a half years after the robbery. Spencer testified as a State's witness. She declined to make an in-court identification of Freimark as the man who robbed her because she never got a good view of his face. On cross-examination, Spencer testified that at some point, a Wichita police officer showed her a series of photographs of possible suspects—what's commonly known as a photo array— and asked her if she could identify anyone. She testified she told the officer she never really saw the robber's face. The officer instructed her to pick out the person who looked the most like the robber. Spencer told the jury she did so but could not remember which photograph she selected.

To understate matters, Spencer's testimony about the photo array came as a surprise to the prosecutor and Freimark's lawyer. The investigative case file forwarded from the Wichita police department to the Sedgwick County District Attorney's office and made available to the defense included nothing about a photo array or the presentation of an array to Spencer. Spencer's testimony prompted an inquiry to Wichita Police Detective Eric Noack, who had been assigned as the lead investigator.

Given the unusual circumstances, Noack testified during the trial about this aspect of the case. Noack told the jurors that he had prepared a photo array and placed the photographs in the case file. But he explained that because Spencer said she did not really see the robber's face, he never showed her the photo array and never instructed another officer to do so. Noack further explained that was his usual practice when a perpetrator wears a mask. Noack testified that had Spencer been shown the photo array, two additional forms would have been included in the file to document the instructions given to Spencer in viewing the photographs and to record any selection she might have made. Noack told the jurors there were no such forms in his investigative file. And he acknowledged he should have forwarded the photo array he prepared to the district attorney's office but neglected to do so.

After Noack testified, Freimark recalled Spencer as a witness. She testified that from the beginning of the investigation, she had told the police she could not make a facial identification of the robber because he wore a mask. Freimark asked the district court to declare a mistrial. The district court declined the request.

At a later hearing, the district court ordered Freimark to serve 216 months in prison on the aggravated robbery conviction, reflecting a presumptive mid-range guidelines sentence, given his criminal history, to be followed by postrelease supervision for 36 months. The district court imposed an eight-month prison sentence on each of the firearms convictions and ordered one of the sentences to be served consecutive to the

4

aggravated robbery prison term with the four remaining sentences to be served concurrent to each other and the robbery sentence. Freimark has appealed.

LEGAL ANALYSIS

On appeal, Freimark asserts that the surprise disclosure about the photo array during the trial violated his constitutional rights and deprived him of a fair hearing in front of the jurors. He also contends the prosecutor made three improper comments to the jurors during closing argument, compromising the trial and the verdicts. We take those points up in that order, augmenting our general recitation of the case history as necessary.

*Late Disclosure of Photo Array*

On appeal, Freimark characterizes the late disclosure of the photo array during the trial as a violation of the State's constitutional obligation to turn over exculpatory evidence to a criminal defendant—commonly known as a *Brady* violation. See *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (prosecution violates criminal defendant's due process rights by failing to disclose exculpatory evidence).

To establish a *Brady* violation: (1) The evidence must be favorable to the accused, either because it is exculpatory, or because it can be used as impeachment evidence; (2) the evidence must have been suppressed by the State, and it is enough to show that a law enforcement agency failed to turn over the material to the prosecutor; and (3) the evidence must be sufficiently material to call into question the outcome at trial. *State v. Breitenbach*, 313 Kan. 73, 97, 483 P.3d 448 (2021); *State v. Hirsh*, 310 Kan. 321, 334, 446 P.3d 472 (2019); see *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (*Brady* disclosure includes impeachment evidence). The prosecutor's good faith does not excuse what would otherwise be a *Brady* violation. *Brady*, 373 U.S.

at 87-88; *Hirsh*, 310 Kan. at 334; *State v. Warrior*, 294 Kan. 484, Syl. ¶¶ 7-8, 277 P.3d 1111 (2012).

The test for materiality is this:

"'[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . . [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."' [Citations omitted.]" *Hirsh*, 310 Kan. at 337.

A late disclosure during trial may be a *Brady* violation, but it is not automatically so. If the defense can make use of the information during the trial notwithstanding the delay, there is no violation. *Breitenbach*, 313 Kan. at 98, *Hirsh*, 310 Kan. at 336.

We review a district court's finding whether a *Brady* violation occurred as a matter of law, giving due deference to any resolution of disputed facts. In turn, we review the denial of a motion for a mistrial based on an alleged *Brady* violation for abuse of discretion. *Breitenbach*, 313 Kan. at 97.

Here, we do not see a *Brady* violation. The identification photographs Noack assembled and put in the investigatory file were not in and of themselves either inculpatory or exculpatory. Had they been provided to the prosecution and turned over to the defense before trial as part of an open file disclosure— something the prosecutor agreed would have happened—the trial likely would

6

have unfolded the same way. Spencer presumably would have been directly asked if she had viewed the array, as actually happened during the trial. Her testimony would have triggered the same consternation in the absence of any documentation that she had viewed the array. And she and Noack would then have covered the same testimonial ground in front of the jurors.[*]

[*]The cross-examination of Spencer about the photo array unfolded this way during the trial:

"Q. [by defense counsel] Were you ever asked to do like a photo lineup where someone came out and showed you different—
"A. Yes.
"Q. —photos of somebody?
"A. Yes.
"Q. Yes, you did?
"A. Yes, I—yeah."

Spencer then explained that she picked out the photograph that she thought was closest to the robber because the officer asked her to, and she reiterated that she "didn't really know for sure." The exchange—particularly the phrasing of the initial question—suggests the lawyer anticipated a negative response. That was confirmed in discussions between the lawyers and the district court later outside the presence of the jury.

As a practical matter, Freimark got to fully air the issue, especially in recalling Spencer as a witness. Moreover, from the trial testimony of the investigating officers and Spencer, it is apparent she never could make a facial identification of the robber. And she didn't do so in front of the jurors. Her undisputed testimony also showed that she chose a photo from the array essentially as a guess to comply with the officer's insistent request that she pick somebody. The record is inscrutable as to whom Spencer picked from the photo array. Pretrial disclosure of the full investigatory file would not have indicated the photo array had even been presented to Spencer, let alone her response in viewing the array.

But even if Spencer's pick could have been determined, that wouldn't have materially shifted the trial evidence one way or the other, given her consistent

7

representation that she couldn't identify the robber. Had she picked Freimark, the selection would have been a fortuitous one with little or no evidentiary heft. Likewise, had she selected a different photograph from the array, the choice would have neither impeached her stated inability to identify the robber nor materially suggested someone other than Freimark committed the crime.

Moreover, the State presented a compelling circumstantial case against Freimark during the trial, built largely on the surveillance videos from his apartment complex shortly before the robbery and from the building near the Little Caesars parking lot. As we have outlined, those videos show Freimark dressed in clothing matching Spencer's description of what the robber wore. They show him with a temporary car tag and using a distinctively beat-up motor vehicle piloted by an accomplice. The evidence was strong and essentially unrefuted at trial. And, as appellate courts regularly repeat, even the gravest crime may be proved with circumstantial evidence. *State v. Kelly*, 322 Kan. 197, 207, 588 P.3d 54 (2026); *State v. Thach*, 305 Kan. 72, 82-84, 378 P.3d 522 (2016).

Taking account of the decidedly peculiar circumstances of this case and the trial evidence, the State's late disclosure of the photo array the lead detective prepared did not deprive Freimark of material evidence that called into question his guilt of the aggravated robbery. There was no *Brady* violation.

*Prosecutor's Closing Argument to Jury*

Freimark contends the prosecutor committed three errors in closing argument to the jurors and deprived him of a fair trial as a result. Lawyers cannot misrepresent relevant legal principles or misstate the trial evidence in their closing arguments to jurors. We examine claims a prosecutor has done so using an error and prejudice standard first outlined in *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). See *State v.*

*Anderson*, 318 Kan. 425, 437, 543 P.3d 1120 (2024) (reiterating and applying *Sherman* standard for prosecutorial error).

The *Sherman* analytical model initially considers whether an error has occurred and then weighs any prejudice to the defendant resulting from the error. Comments made during closing argument will be considered error if they fall outside the wide latitude afforded prosecutors in discussing the evidence and the law. 305 Kan. at 109. If an appellate court finds the challenged argument to be prosecutorial error, it must then consider prejudice measured by the test set out in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), for a constitutional wrong. The State, as the party benefiting from the error, must demonstrate "'beyond a reasonable doubt'" that the mistake "'did not affect the outcome of the trial'" taking account of the full trial record. *Sherman*, 305 Kan. at 109 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6). That is, the appellate court must determine if the error compromised the defendant's right to a fair trial—a constitutional protection rooted both in due process and in the right to trial itself. 305 Kan. at 98-99, 109.

Freimark first seems to claim the prosecutor improperly expressed a personal opinion on Spencer's credibility in making this argument:

> "So here's the deal about Detective Noack. I hate when an officer makes a mistake. Officers make mistakes, prosecutors make mistakes. I've seen other cops have to take their medicine on the stand, and he did do that. He acknowledged that he had that lineup in his file and he got it over here late. I hate it when that happens, but it happens. But here's the deal: *We always knew when we were preparing this case that Casey Spencer was not going to be able to identify her robber. And Noack may have prepared that lineup, somebody went back out and recontacted Casey. He has no recollection of it, but here's the deal: We knew Casey could not identify her robber because she said he was concealed in the face*." (Emphasis added.)

During closing arguments, lawyers may not inform the jurors of their personal opinions about the credibility of a witness. *State v. Peppers*, 294 Kan. 377, 396, 276 P.3d 148 (2012); *State v. Dishner*, No. 124,597, 2023 WL 3909807, at *3 (Kan. App. 2023) (unpublished opinion) ("Lawyers, including prosecutors, may not offer jurors their personal opinions on the credibility of witnesses."). Here, Freimark's point seems to pivot on the prosecutor's repeated use of the phrase "we know" in the closing argument. The phrase is problematic because it may be improper depending on how it is used. If a prosecutor refers to undisputed facts, as in "we know" the defendant lived down the block from the victim, then the phrase is unobjectionable. If, however, the prosecutor introduces one version of disputed evidence with the phrase, it typically amounts to an impermissible expression of personal opinion. See *State v. Douglas*, 313 Kan. 704, 715-16, 490 P.3d 34 (2021).

The prosecutor's comment here doesn't seem to be an assessment of Spencer's truthfulness. Rather, standing alone, it looks like a comment about facts that typically would not be offered as evidence—what the State knew about Spencer's testimony going into trial, i.e., she would not be able to make a positive in-court identification of Freimark as the robber. Given the distinctly unusual circumstances that developed during trial, Spencer wound up testifying that she told the police from the outset that she could not identify the robber. And that's not in dispute. So the prosecutor's remark sits in the ballpark of fair comment on the trial evidence and served to explain why Spencer's selection of a suspect from the photo array was of little consequence in establishing that Freimark committed the aggravated robbery.

Freimark next contends the prosecutor improperly referred to the planning that went into the robbery, and he says the argument unfairly portrayed him as particularly dangerous or blameworthy, especially when proof of a detailed plan is not necessary to convict a defendant of aggravated robbery. The prosecutor told the jurors:

10

"So I don't believe that robbery of that pizza place happened in a vacuum. Right? What were the chances you wanted to do a robbery and you pull into a back parking lot and the owner would be coming out with a video camera missing from there and holding a bank bag. So talk amongst yourselves. What kind of planning? There had to be some planning into knowing, to be in that position at 10:00 A.M. in the morning and the manager of that Little Caesars would have the receipts from the day before in a bank bag and would be running it to the bank. Man, that's a tough one to happen in a vacuum. Somebody—there had to be some planning going on, plus you have a driver removing the car as the robbery goes down. Then knowing there's a hole in the fence. You know, [d]efendant had help, but there was planning."

This, too, seems to be fair comment on the evidence and serves to tie the video from the apartment complex the morning of the robbery to the robbery itself and Freimark's identity as the robber. As we have outlined, the evidence showed Freimark with the temporary tag and getting into the car with an accomplice to carry out the robbery and to make a getaway. That necessarily entailed a plan. The prosecutor's argument simply pointed to what was essentially obvious from the evidence. It did not unfairly prejudice Freimark.

Finally, Freimark says the prosecutor improperly invoked "public safety" while imploring the jury to convict him of aggravated robbery. The prosecutor argued to the jury this way:

> "The second thing is this. I want you to talk about this: Concealment. Right? You know, because somebody wears a mask or we don't have video, we don't just give up on a case. We keep the—you know, we talked about public safety a little bit in jury selection. Do you feel safe in this city? And some of the answers were, 'Well, I take precautions and I watch my circumstances and I don't go to certain places.' Well, Casey didn't really have a choice. She had to go to work. Right?"

Freimark contends the prosecutor appealed to the jurors to act as protectors of the community and to promote "public safety" by convicting him. This argument approaches the sometimes blurry line separating the permissible from the objectionable. Public safety is a fraught topic in a prosecutor's closing argument and could be an impermissible pitch to passion rather than to the evidence bearing on guilt. See *State v. Finley*, 268 Kan. 557, 571-72, 998 P.2d 95 (2000); *State v. Witten*, 45 Kan. App. 2d 544, 553, 251 P.3d 74 (2011); *State v. Aguero-Hernandez*, No. 127,063, 2025 WL 3686927, at *6-7 (Kan. App. 2025) (unpublished opinion). For purposes of resolving the issue, we assume without deciding that the argument here crossed the line.

But our assumption does not ultimately aid Freimark. The prosecutor's comment was brief and not especially inflammatory or emotional. Given the tight circumstantial evidence the State presented establishing Freimark's guilt, we are persuaded beyond a reasonable doubt that Freimark was not denied a fair trial because of this aspect of the prosecutor's closing argument.

Affirmed.